**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>MELVIN LANDRY, JR.,<br><br>    Defendant.<br>_____/ | No. CR 13-00466-1 JSW<br><br>**ORDER DENYING MOTIONS TO SUPPRESS IDENTIFICATION EVIDENCE**<br><br>**(Docket Nos. 57, 291)** |

Now before the Court are the motions to suppress identification evidence filed by Defendant, Melvin Landry, Jr. ("Landry"). The Court has considered the parties' papers, including the color copies of the photographic line-ups at issue (Docket No. 337), relevant legal authority, the record in this case, and it has had the benefit of oral argument. The Court HEREBY DENIES Mr. Landry's motions.

**BACKGROUND**

Landry is charged with one count of racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. section 1962(c), one count of RICO conspiracy, one count of conspiracy to commit robbery affecting interstate commerce, in violation of 18 U.S.C. section 1951(a) (the "Hobbs Act"), and seven counts of robbery, in violation of the Hobbs Act. These robberies are included as predicate acts in the RICO counts.

The identifications at issue in this motion were made following robberies that occurred at: (1) a Rite-Aid store, in San Leandro, California (the "Rite-Aid Robbery"); (2) a Safeway

store in Oakland, California (the "Safeway Robbery"); (3) a Walmart store on Hesparian Boulevard in San Leandro, California ("the Hesparian Boulevard robbery"); (4) a Walmart store on Davis Street in San Leandro ("the Davis Street robbery"); and (5) a Walmart store on Albrae Street, in Fremont, California (the "Fremont robbery"). (*See* Docket No. 291, Def. Exs. A-B, D; Docket No. 57-1, Declaration of Doron Weinberg ("Weinberg Decl."), at 2:6-7, 2:9-12, Exs. 4, 6-7.)

The facts set forth in the remainder of this Order are drawn from the exhibits submitted in connection with the parties' briefs and, unless otherwise noted, are undisputed.[1]

## ANALYSIS

**A.  Applicable Legal Standards.**

Landry argues that each of the identifications at issue was impermissibly suggestive and, therefore, all evidence of the out-of-court identifications should be excluded. In order to determine whether the procedures used were "so impermissibly suggestive as to lead to a substantial likelihood of mistaken identification, [the court] must examine the totality of the circumstances." *United States v. Bagley,* 772 F.2d 482, 492 (9th Cir. 1985). Even if a court finds that the procedures used were unnecessarily suggestive, the court need not exclude evidence of the identification if, under the totality of the circumstances, "the identification is sufficiently reliable." *Id.*

In order to evaluate the reliability of an out-of-court identification, the Court considers such factors as: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation." *Id.* (quotations and citations omitted).

---

[1]  In its opposition to Defendant's original motion, the Government refers to a number of facts that are unsupported by evidence. Accordingly, the Court has not considered those facts. Defendant submitted exhibits with his second motion, but he did not submit a declaration that purports to authenticate the exhibits. The Government submitted exhibits with its opposition brief to Defendant's first motion and did not submit a declaration to authenticate those exhibits. *See* N.D. Crim. L.R. 2-1; N.D. Civ. L.R. 7-5(a). Because neither party objected to the exhibits on that basis, the Court has considered those exhibits.

2

1  The Court then "weigh[s] the indicia of reliability against the corrupting effect of the suggestive
2  identification procedure itself." *Id.*

3  **B.    The Court Denies the Motions.**

4    **1.    The Rite-Aid Robbery and the Line-Up Shown to T.M.**

5    The Rite-Aid was robbed on February 17, 2012, and three Rite-Aid loss-prevention
6  officers ("LPOs") were witnesses.[2] According to the police report, one of the LPOs saw "S-1,"
7  later identified as co-defendant Dominique Martin ("Martin"), in the store aisles and observed
8  him take some latex gloves and leave the store without paying for the gloves. (*See, e.g.,* Def.
9  Ex. D at ML-001950.) The other LPOs did not observe Martin take the gloves, but they
10 assisted their colleague when Martin left the store. (*Id.* at ML-001950-52.) Martin attempted to
11 evade the LPOs, but they eventually caught him. However, as the LPOs were bringing Martin
12 back into the Rite-Aid, "S-2," later identified as Landry, drove up in a car and offered to pay for
13 the gloves. Two LPOs stated that they told Landry it was too late and that they had called the
14 police. (*Id.* at ML-001950-51.) All of the LPOs stated that Landry pointed a gun at them, told
15 them to let Martin go, and they complied.

16   Each of the LPOs provided the San Leandro Police Department ("SLPD") with a
17 description of both suspects. (*Id.* at ML-001950-52; *see also* Def. Ex. F.) The police report
18 describes Landry as "BMA 20-29 years old, unk [*sic*] height and weight, shaved black hair,
19 brown eyes, moles on the left side of his face near his temple, black jacket with brown trim,
20 light complexion, armed with a silver semi-automatic handgun." (Def. Ex. D at ML-001950.)
21 However, only one of the LPOs mentioned the moles in his statement. (*See* Def. Ex. F at ML-
22 001971.)

23   On November 7, 2013, Special Agents Paul F. Healy ("SA Healy") and Lauri Marc
24 Ahlman ("SA Ahlman"), of the Federal Bureau of Investigation, interviewed T.M. (Def. Ex. G
25 at ML-003934.) During the interview, SA Healy left the room, and T.M. signed a "TF-3173
26 Photo Line-Up Waiver Statement." (*Id.*; Def. Ex. H.) SA Ahlman "conducted a double blind

---

[2] The LPOs' names are redacted. The Government has stated that the initials of the LPO who was shown the photographic line-up are T.M., and states his witness statement is located at Defendant's Exhibit F at ML-001973.

3

1  sequential photographic line up." (Def. Ex. G at ML-3934.) The photographic line-up
2  consisted of six men, and it is undisputed that each of the six photographs, including Landry's,
3  has been altered to place a black dot on the left cheek. (Def. Ex. H.)

4  After T.M. viewed each of the photographs, SA Ahlman asked if T.M. wanted to see the
5  photographs again. T.M. requested the fourth photograph, and SA Ahlman showed him all of
6  the photos a second time in sequential order. T.M. stopped the line-up on the fourth
7  photograph, which is of Landry, and stated that he recognized the individual shown as the
8  suspect in the vehicle. (Def. Ex. G at ML-003934; Def. Ex. H at ML-000796.)

9  Landry argues that the composition of the photographic line-up was impermissibly
10 suggestive, because of the addition of the fake moles and because Landry was the only suspect
11 looking upward in a threatening manner. The Court has reviewed the color copy of the
12 photographic line-up, and even if Landry is the only person whose head is tilted up, "a minor
13 difference in face position does not render a line-up impermissibly suggestive." *United States*
14 *v. Guevara*, 745 F. Supp. 2d at 1039, 1047 (N.D. Cal. 2010).

15 Further, because one of the LPOs advised the police on the night of the robbery that the
16 man in the car had moles on his face, it was not unreasonable to add this characteristic, in the
17 same manner and in the same location, to each of the photographs. In addition, there is nothing
18 about the alteration that would draw attention to Landry's photograph in particular. *See, e.g.,*
19 *United States v. Dunbar*, 767 F.2d 72, 74 (3rd Cir. 1985) (finding that alterations to include a
20 beard and cap on all suspects was not impermissibly suggestive, where "each photograph was
21 altered in the same way").

22 Although Landry also argues that the procedures used were suggestive, T.M. was
23 admonished that "[t]he person who committed the crime may or may not be included," and that
24 he "should not feel [he had] to make an identification." (Def. Ex. H at ML-000792.) In
25 addition, SA Healy and SA Ahlman conducted a "double blind sequential line-up." The
26 authorities on which Landry relies suggest that this method is designed to decrease the
27 likelihood of misidentification. *See, e.g., United States v. Brown*, 471 F.3d 802, 804-05 (7th
28 Cir. 2006) (noting that research has shown that "repeated sequential display" and having line-up

4

1 conducted by officer who does not know which, if any, photo is a suspect are "better" methods
2 for conducting line-ups); *State v. Henderson*, 208 N.J. 208, 248-49 (2011) (finding failing "to
3 perform blind lineup procedures can increase the likelihood of misidentification").

4 The Court has considered the totality of the circumstances involved in the photographic
5 line-up shown to T.M., and it concludes that the composition of the photographic line-up or the
6 procedures used with T.M. were not so "impermissibly suggestive as to lead to a substantial
7 likelihood of mistaken identification." *Bagley*, 772 F.2d at 492.

8 The Court denies Landry's motion to exclude the identification by T.M.

### 2. The Safeway Robbery and the Line-Up Shown to the Bookkeeper.

10 The Safeway was robbed on February 22, 2012. Members of the Oakland police
11 department ("OPD") responded and interviewed the witnesses, a security guard and a
12 bookkeeper. (*See, e.g,* Def. Ex. A at ML-000042-43.) On the date of the incident, the
13 bookkeeper stated that "S1," later identified as Landry, "had a big mole on his cheek" and
14 stated that she could identify him. (Def. Ex. B at ML-000059.) On or about May 21, 2013,
15 OPD Officer Keely received information that the store would be robbed again. Officer Keely
16 interviewed the bookkeeper, who advised him that "she was robbed at gun point by a male
17 black who was wearing a mask. However, the suspect's mask was not covering his entire face.
18 She stated that he had a distinct mole on the left side of his face." (*Id.* at ML-000057.) The
19 bookkeeper also advised Officer Keely that she had a conversation about the robbery with
20 another Safeway employee, Theilema Clark, in December 2012. Ms. Clark showed the
21 bookkeeper "a photo of the suspect from video from KTVU." (*Id.*) The bookkeeper stated that
22 "once she saw the picture she recognized him as the suspect that robbed her." (*Id.*)

23 Officer Keely created a photographic line-up and placed Landry's photograph in the
24 number 2 spot. Officer Keely also stated that because Landry "has a distinctive mole on his left
25 cheek, I took a black marker and put the mark in the same place for all six subjects." (*Id.*)
26 Officer Keely stated that he "admonished" the bookkeeper and showed her the photographic

5

1  line-up.³ The bookkeeper "quickly picked [Landry] out of position #2 and said that he is the
2  suspect who robbed her." (*Id.*)

3  Landry also challenges the out-of-court identification made by the bookkeeper on the
4  basis that OPD altered each of the photos used in the line-up. For the reasons set forth above,
5  with regard to T.M., because the bookkeeper described the suspect's moles as a distinguishing
6  feature, the Court concludes that it was not unreasonable for the OPD to alter the photographs
7  in an effort to make the filler photographs more similar to Landry's photograph. Further, the
8  Court has reviewed the color copy of the photographic line-up, and it finds that there is nothing
9  about the alterations that would draw attention to Landry in particular.

10  Landry also challenges the procedures used with the bookkeeper. It is undisputed that
11  one of the bookkeeper's colleagues showed her a picture of Landry before Officer Keely
12  showed her the line-up with Landry's photograph. "The repeated showing of [a] picture of an
13  individual" may reinforce" the image of the photograph in the mind of the viewer," and, thus
14  might be somewhat suggestive. *Bagley*, 772 F.2d at 493; *cf. Guevara*, 745 F. Supp. 2d 1039,
15  1047-1048. However, the Ninth Circuit has found that showing a witness surveillance photos
16  prior to showing them a photographic line-up is not impermissibly suggestive. *See United*
17  *States v. Beck*, 418 F.3d 1008, 1013 (9th Cir. 2005); *United States v. Monks*, 774 F.2d 945, 957
18  (9th Cir. 1985). It also is undisputed that Officer Keely did not use a blind or double-blind
19  procedure. *See, e.g., Brown*, 471 F.3d 804-05; *Henderson*, 208 N.J. at 248-49.

20  The Court has considered the totality of the circumstances, and it concludes that neither
21  the composition of the photographic line-up nor the procedures used were so "impermissibly
22  suggestive as to lead to a substantial likelihood of misidentification." *Bagley*, 772 F.2d at 492.

23  The Court denies the motion to suppress the identification by the bookkeeper.

24  **3.    The Hesperian Boulevard Robbery and the Line-Up Shown to J.F.**

25  The Hesperian Boulevard Walmart was robbed on October 19, 2012, and was witnessed
26  by J.F. There is no evidence in the record about what J.F. told the SLPD immediately following

---

28  ³ The Government submitted a copy of that admonition with the color copies of the photographic line-ups. (*See* Docket No. 337-2, at p.2.) However, because it was not part of the original evidentiary record, the Court has not considered it.

6

1 the robbery. On February 4, 2013, SLPD Detective M. Benz ("Detective Benz") provided J.F.
2 with the SLPD Photo Line-Up Admonition and showed her two photographic line-ups, one with
3 Martin's photograph and one with Landry's photograph. (Declaration of Doron Weinberg
4 ("Weinberg Decl."), Ex. 4; Gov. Ex. C.) J.F. pointed to Landry and stated "I've seen this
5 person in the store but not sure if he's related to the robbery." (Weinberg Decl., Exs. 3-4, Gov.
6 Ex. C.)

Landry moves to suppress any in-court identification by J.F on the basis that it will have been tainted by the fact that J.F. viewed the photographic line-up and, presumably, now knows that Landry has been accused of the Hesperian Boulevard robbery. There is nothing in the record to suggest that J.F. told the police that the suspect had any unique or distinguishing characteristics by which J.F. could identify the suspect. In addition, J.F. received and signed the SLPD Photo Line-Up Admonition, which states that "[t]his group of photos **may or may not** include a photograph of the person being investigated for this offense, and **you are under no obligation** to make an identification." (Gov. Ex. C (emphasis in original).)

The Court has reviewed a color copy of the photographic line-up used with J.F., and it concludes that the composition of the line-up does not render it so impermissibly suggestive that it would lead to a substantial likelihood of misidentification. Each of the men in the photographic line-up have similar complexions, hairstyles, and facial hair. The shapes of their face also are similar. Athough Landry is the only person in the photographic line-up with a mole, courts have approved line-ups where the suspect was the only person in the line-up who had a unique facial characteristic. *See, e.g., United States v. Ryono*, 867 F.2d 614, 1989 WL 7541, at *3 (9th Cir. 1989) (noting that "[d]istinctive scars or birth marks are often the type of characteristics which make it difficult for law enforcement officers to find similar photographs to place in a photo spread); *Guevara*, 745 F. Supp. 2d at 1047 (concluding photographic line-up was not impermissibly suggestive where defendant was only individual with a scar) (citing *United States v. Barron*, 575 F.2d 752, 755 (9th Cir. 1978).)

The Court denies Landry's motion to exclude an in-court identification by J.F.

//

//

### 4. The Davis Street Robbery and the Line-Up Shown to D.S.

The Davis Street Walmart was robbed on December 17, 2012. On the night of the robbery, D.S. provided a description of one of the suspects, later identified as Landry, to SLPD Officer Cesaretti. D.S.'s description is listed in the police report as "BMA 19-20 years, 5'08", thin build wearing olive [True Religion] hat, dark hoodie, dark jeans. Had a black semi-auto in left hand. Had white bandana covering face." (Weinberg Decl., Ex. 5.)

On February 5, 2013, Detective Benz contacted D.S. at the Davis Street Walmart. D.S informed Detective Benz that "she read online that Fremont had two people arrested regarding a robbery at a Wal-Mart [*sic*] in" Fremont. (*Id.*) According to Detective Benz, D.S. also "said the online photograph of Landry was a match to S1," who robbed the Davis Street Walmart. D.S. "said the face, complexion and the mole on the left cheek stood out to her." (*Id.*) Detective Benz provided D.S. with the SLPD Photo Line-Up Admonition and then showed her a photographic line-up, which included a photograph of Martin. (*Id.*; *see also* Gov. Ex. D.) D.S. did not identify anyone, although she stated that Martin looked familiar but she was not sure why. (Weinberg Decl., Ex. 5; Gov. Ex. D.) "Even though [D.S.] stated that she had seen a photograph of Landry online, [Detective Benz] showed [D.S.] a photo line-up with Landry." (Weinberg Decl., Ex. 5.) D.S. "immediately" pointed to Landry's photograph and said "that's the guy with the gun that robbed us." (*Id.*; *see also* Gov. Ex. D.)

Landry again challenges D.S.'s identification based, in part, on the fact that Landry is the only suspect in the photographic line-up with a mole. When D.S. provided a description to the SLPD on the night of the robbery, D.S. did not reference a mole. By the time Detective Benz contacted D.S. to conduct the photographic line-up, D.S. had seen a photograph of Landry online, and she specifically mentioned the fact that the mole was one of the features that stood out to her. D.S. advised Detective Benz of that fact before he showed D.S. the photographic line-up. "The repeated showing of [a] picture of an individual" may reinforce" the image of the photograph in the mind of the viewer," and, thus might be somewhat suggestive. *Bagley*, 772 F.2d at 493; *cf. Guevara*, 745 F. Supp. 2d 1039, 1047-1048. However, as stated, it is not

1  impermissibly suggestive to show a witness surveillance photographs before a photographic
2  line-up. *Beck*, 418 F.3d at 1013; *Monks*, 774 F.2d at 957.

3  It also is undisputed that Detective Benz created the photographic line-up and showed it
4  to D.S. Thus, the line-up was not conducted on a blind or double-blind basis. *See, e.g., Brown*,
5  471 F.3d 804-05; *Henderson*, 208 N.J. at 248-49. However, Detective Benz administered the
6  SLPD's Photo Line-Up admonition to D.S. The Court has considered the totality of the
7  circumstances, and it concludes that the composition of the photographic line-up and the
8  procedures used were not so "impermissibly suggestive as to lead to a substantial likelihood of
9  mistaken identification." *Bagley*, 772 F.2d at 492.

10  Even if the procedures used with D.S. could be found to be impermissibly suggestive,
11  the Court is required to "weigh the indicia of reliability against the corrupting effect of the
12  suggestive identification procedure." *Id.* D.S. was able to provide a description of the suspect's
13  clothing and was able to get close enough to the suspect to determine he was wearing a True
14  Religion hat. D.S. also stated that the suspects had been "at customer service for approximately
15  10 minutes prior to the robbery." (Weinberg Decl., Ex. 5.) In addition, the description suggests
16  that D.S. was not focused only on the weapon. D.S.'s general description of the suspect, which
17  did not reference a mole, is consistent with the photograph of Landry used in the photographic
18  line-up. There also is no evidence in the record to suggest that D.S. was not certain about her
19  identification of Landry. Counterbalanced against those facts is the fact that there is no
20  evidence in the record about the lighting conditions in the Davis Street Walmart. In addition,
21  Detective Benz showed D.S. the photographic line-up over a year after the robbery occurred.
22  On balance, however, the Court concludes that there are sufficient indicia of reliability to
23  outweigh any effects of suggestiveness.

24  The Court denies Landry's motion to exclude the identification by D.S.

25  **5.  The Fremont Robbery and the Line-Up Shown to A.B.**

26  The Fremont Walmart was robbed on January 3, 2013. On the night of the robbery,
27  Fremont Police Department ("FPD") Officer Brent Butcher interviewed A.B., who stated that
28  "he did not recall any significant features on either S-1[,]" later identified as Landry. A.B.

9

1    stated that "it happened so fast and all he focused on was the handgun." (Weinberg Decl., Ex.
2    6.)

3    On January 15, 2013, FPD Detective Joshua Ehling ("Detective Ehling") created two
4    photographic line-ups, based on his review of surveillance photographs of the Fremont Robbery
5    and a robbery of a Walmart in Sacramento, and based on information he received from other
6    FPD Detectives. On January 16, 2013, Detective Ehling met with A.B. at the FPD. According
7    to the record, Detective Ehling had A.B. "review the video surveillance from the night that the
8    robbery occurred at Walmart. [A.B.] also told [Detective Ehling] that he had previously
9    reviewed the surveillance footage on his own while working at" Walmart. (Weinberg Decl., Ex.
10   7.) Detective Ehling then had A.B. read the FPD Photographic Line-up Admonition. A.B.
11   stated that he understood the form and signed it. (*Id.*; *see also* Gov. Ex. A.) When A.B.
12   reviewed the photographic line up with Landry's photo, A.B. "pointed to the subject [Landry]
13   and stated that he was the one that pointed the gun at him. [A.B.] circled the picture of Landry"
14   and wrote "[p]ointed a gun at my face/stole the registers." (Weinberg Ex. 7; Gov. Ex. A.)

15   Landry challenges A.B.'s identification, based on the fact that Landry was the only
16   suspect in the photographic line-up with a mole. A.B. did not advise the SLPD that the suspect
17   he saw had a mole. Therefore, for the same reasons the Court finds that the composition of the
18   photographic line-up used with D.S. was not impermissibly suggestive, the Court finds the
19   composition of the photographic line-up used with A.B. was not impermissibly suggestive.

20   The Court also concludes that the procedures used were not impermissibly suggestive.
21   Although Detective Ehling created the photographic line-up and administered it, A.B. received
22   the FPD's Photographic Line-up Admonition, which states that "[t]his group of photographs
23   may or may not contain a picture of the person who committed the crime now being
24   investigated. The fact that photos are being shown to you should not cause to believe or guess
25   that the guilty person has been caught. You do not have to identify anyone." (Gov. Ex. A.)
26   It also is undisputed that A.B. reviewed the surveillance footage before reviewing the
27   photographic line-up, and it also is undisputed that Detective Ehling also showed him that
28   footage before he showed A.B. the photographic line-up. As set forth above, those facts do not

render the procedures used impermissibly suggestive. *Beck*, 418 F.3d at 1013; *Monks*, 774 F.2d at 957.

The Court denies Landry's motion to exclude the identification by A.B.

## CONCLUSION

For the foregoing reasons, the Court DENIES Landry's motions to suppress identifications. If either party believes that time between the resolution of this motion and the next hearing should be excluded from the Speedy Trial Act calculation, that party should file a motion with the Court.

**IT IS SO ORDERED.**

Dated: March 12, 2015

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE